CITY OF LANSING *v.* TOWNSHIP OF LANSING.

1. STATUTES—AMBIGUITY—CONSTRUCTION.
A statute must be actually ambiguous or of doubtful meaning in order to be subjected to a judicial interpretation, the mere fact that it appears impolitic or unwise being insufficient to justify judicial construction.

2. SAME—CONSTRUCTION BY SUPREME COURT—INTENT.
The Supreme Court must interpret a statute as the Court finds it and give effect to the intention of the legislature as ascertained therefrom.

3. SAME—CONSTRUCTION—AMBIGUITY.
A statute is not open to construction as a matter of course, but only where the language used in the statute requires interpretation, such as where it is ambiguous or where 2 or more constructions can be placed upon it by reasonable minds.

4. SAME—UNAMBIGUOUS STATUTE.
A plain and unambiguous statute is to be applied, and not interpreted, since such a statute speaks for itself, and any attempt to make it clearer is a vain labor and tends only to obscurity.

5. MUNICIPAL CORPORATIONS—ANNEXATION—DIVISION OF PERSONAL PROPERTY—CONSTRUCTION OF STATUTES—AMENDMENT—EQUITY.
Statute providing for division between city and township of personal property of township, where part of township territory is annexed to home-rule city, in the same ratio as the assessed

REFERENCES FOR POINTS IN HEADNOTES

[1, 4]  50 Am Jur, Statutes §§ 225, 226.
[2, 6]  50 Am Jur, Statutes §§ 223, 228.
[7]  50 Am Jur, Statutes §§ 375, 376.
[9, 10]  37 Am Jur, Municipal Corporations § 23 *et seq.*
[11]  37 Am Jur, Municipal Corporations § 34.
[12]  12 Am Jur, Contracts §§ 227, 241.
[13, 14]  12 Am Jur, Contracts § 315 *et seq.*
[15]  12 Am Jur, Contracts § 317.
[20]  14 Am Jur, Costs §§ 11, 26.

value of annexed territory bears to the assessed value of remaining portion of township *held*, plain, unambiguous, not subject to interpretation, not affected by change of ratio in amendment of statute enacted subsequent to annexation, nor by fact that plaintiff sought relief in an equity court (CL 1948, § 117.14).

6. STATUTES—CONSTRUCTION—INTENT.

Courts of equity, as well as of law, must apply legislative enactments in accord with the plain intent of the legislature.

7. SAME—CONSTRUCTION—HARDSHIP.

The fact that a plain, unambiguous statute may, in certain instances, work great hardship is an argument that should be addressed to the legislature rather than to the court.

8. SAME—CLASSIFICATION—BURDEN OF PROOF.

It is assumed that there was a sound basis in the reason for the legislature's classification in a statute, until the contrary is shown, the party assailing the classification having the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary.

9. MUNICIPAL CORPORATIONS—ANNEXATION—DIVISION OF PERSONAL PROPERTY—STATUTES—DUE PROCESS—EQUAL PROTECTION.

Township, some of whose territory was annexed to city, failed to show statutory ratio for division of personal property, based on ratio of assessed value of annexed territory to assessed value of remaining part of the township, was unreasonable, hence, its claim that such statute was unconstitutional for violating due process and equal protection clauses of the Constitutions of the United States and the State is untenable (US Const, Am 14; Mich Const 1908, art 2, §§ 1, 16; CL 1948, § 117.14).

10. TOWNSHIPS—ANNEXATION TO HOME-RULE CITY—DIVISION OF PERSONAL PROPERTY—WATERWORKS SYSTEM.

A waterworks system which had been installed in township territory and financed under the revenue bond act, prior to annexation of some of the township to home-rule city, was personal property held in trust by the township for the benefit of the people of the township and not subject to division between the township and city on annexation (CL 1948, §§ 117.14, 141.101 *et seq.*).

11. SAME—ANNEXATION—CONTRACTS—CONSTRUCTION OF FIRE STA-
TIONS.

Finding of trial court that contract for the construction of 4
fire stations for defendant township was an entire, and not
divisible, contract and that the indebtedness thereunder was
created when the contract was executed *held*, correct, notwith-
standing contractor's performance was not complete and he
had received some payments before annexation of some town-
ship territory to plaintiff home-rule city, hence, plaintiff was
required to bear its proportionate share of liability thereunder
(CL 1948, § 117.14).

12. CONTRACTS—INTENT—CONSTRUCTION AS ENTIRE OR DIVISIBLE.

The intention of the parties, as gathered from the circumstances
of the case and from the subject matter of the contract, con-
trols in determining whether a building and construction con-
tract is entire or divisible and such construction is guided by
a respect to general convenience and equity.

13. SAME—CONSTRUCTION WORK—CONSIDERATION—PAYMENT.

A contract for the construction of an entire work or structure
for a fixed compensation is considered as entire and not divis-
ible, especially where it is stipulated that the compensation
is not to be paid until the work or structure is completed, and
also where even when payments are not agreed to be made by
items in the event there is more than 1 item involved.

14. SAME—CONSTRUCTION AS ENTIRE OR DIVISIBLE.

Generally, a contract is entire when, by its terms, nature and
purpose, it contemplates that each and all of its parts are
interdependent and common to one another and to the considera-
tion, and is severable when, in its nature and purpose, it is
susceptible of division and apportionment.

15. SAME—TEST OF DIVISIBILITY.

The singleness or apportionability of the consideration for a
contract is the principal test in determining whether the con-
tract is entire or divisible, for, if the consideration to be paid
is single and entire, the contract must be held to be entire, al-
though the subject thereof may consist of several distinct and
wholly independent items.

16. TOWNSHIPS—ANNEXATION TO HOME-RULE CITY—APPORTIONMENT
OF LIABILITIES—CONTRACTS.

Township's contract for construction of 4 fire stations, for which
payment was to be made contingent upon progress of the work,
on the whole or entire contract, not on the completion of a

specific portion, which contained a clause for liquidated damages in the event this entire contract were not completed within time specified, was an entire contract, and where home-rule city annexed a part of the township before contract was completed the city must bear its proportionate share of the full contract price (CL 1948, § 117.14).

17. MUNICIPAL CORPORATIONS—ANNEXATION—TOWNSHIP TERRITORY—DIVISION OF LIABILITY UNDER CONTRACTS.

A claimed violation of the provision of the State Constitution barring the extension of the credit of the State is not involved, where it is determined that township's contract for the construction of 4 fire stations was entire and complete and that liability thereunder existed at time city annexed a part of the township territory (Const 1908, art 10, § 12; CL 1948, § 117.94).

18. TOWNSHIPS—AT-LARGE DRAIN ASSESSMENTS—GENERAL OR CONTINGENT FUNDS.

Township-at-large drain assessments when levied according to the law in effect prior to amendment in 1949, were not the debt of the township but of the property owners therein on whose property the assessments were levied, hence, since municipal funds are subject to disposition only in accordance with statutory authority, the township's general or contingent fund could not properly be used to pay the private debts of the township's taxpayers (CL 1948, § 270.3, as amended by PA 1949, No 146).

19. SAME—AT-LARGE DRAIN TAXES—APPORTIONMENT UPON ANNEXATION.

Township-at-large drain taxes which had been ordered paid from either the general or contingent fund by township pursuant to pertinent amendatory statute at time of annexation of its territory to home-rule city were not a liability of the township at such time, hence, it is unnecessary to determine constitutionality of act permitting use of township general or contingent funds therefor as such sum was not a subject of division between township and city under the statute in effect at time of annexation (CL 1948, § 117.14; CLS 1954, § 270.3).

20. COSTS—TOWNSHIPS—ANNEXATION—DIVISION OF PERSONAL PROPERTY AND LIABILITIES—FAILURE OF EITHER PARTY TO PREVAIL.

No costs are allowed in suit for apportionment of personal property and liabilities upon annexation of township territory to a home-rule city, where neither party has prevailed in the entirety (CL 1948, § 117.14).

Appeal from Ingham; Cash (Paul R.), J., presiding. Submitted October 7, 1958. (Docket No. 6, Calendar No. 45,820.) Decided July 13, 1959.

Bill by the City of Lansing, a municipal corporation, against the Township of Lansing to determine, upon city's annexation of territory, a proper division of assets and liabilities. Decree granting partial relief. Plaintiff appeals. Defendant cross-appeals. Affirmed in part and reversed in part, with decree ordered to enter accordingly.

*Joseph Lavey* (*George R. Sidwell,* of counsel), for plaintiff.

*Claude J. Marshall,* for defendant.

Kavanagh, J.   November 12, 1949, part of the territory of the defendant township of Lansing contiguous to the plaintiff city of Lansing was annexed to the city by a vote of the people of the township.

The city of Lansing is incorporated as a home-rule city. The annexation raised certain issues which are the subject matter of this suit, all of which involve the division of the assets and liabilities of the township between the city and the township. Problems with respect to the real property division appear to have been worked out between the parties without difficulty. A stipulation was entered into which narrowed the dispute down to 4 issues, which are as follows:   •

(1) What is the ratio of the division of the personal property of the township between the township and the city?

(2) Is the Lansing township west side water-supply system personal property and subject to a division between the township and the city?

(3) To what extent was the contract to construct 4 fire stations, executed on August 26, 1949, and which contract has a balance due of $61,117.05, an indebtedness of the township on the date of annexation.

· (4) Are the township-at-large drain taxes of 1949, 1950, and 1951 a liability of the township at the time of annexation to the city?

· The answer with respect to the first question would seem to be a simple one since the statute then in effect, CL 1948, § 117.14 (Stat Ann 1949 Rev § 5-.2093), with reference to annexation of territory by home-rule cities provides, in part:

"Whenever a part of a city, village or township is annexed to a city, all of the personal property belonging to any such city, village or township from which territory is detached shall be divided between the township, city or village from which said territory is detached and the city to which the territory is annexed, *in the same ratio as the assessed valuation of the taxable property in the territory annexed bears to the assessed valuation of the taxable property in the remaining portion of the city, village or township from which said territory is taken.*" (Emphasis supplied.)

It was stipulated in the instant case that the assessed valuation of the taxable property of the whole township on annexation was $20,255,652. The assessed valuation of the taxable property of the part of the township annexed was $5,072,592, and the assessed valuation of the remaining part of the township was $15,183,060. Under the statute applicable at the time of annexation in 1949, the division of the personal property was:

Part annexed

Remaining portion of township.

Thus, the division of personal property ratio is:

$$\frac{\$\ 5{,}072{,}592}{\$15{,}183{,}060.}$$

In cities other than home-rule cities, school districts, et cetera.,* the ratio is:

$$\frac{\text{The part annexed}}{\text{Whole township or district.}}$$

CL 1948, § 117.14 was amended by PA 1951, No 158 (CLS 1954, § 117.14 [Stat Ann 1955 Cum Supp § 5.2093]), to change the rule with respect to home-rule cities,. and provided that the ratio of division of the personal property in home-rule cities was:

$$\frac{\text{The part annexed.}}{\text{Whole township.}}$$

The chancellor indicated he was convinced that the legislature had made a mistake in passing the law relative to the ratio of the division of personal property on annexation to· a home-rule city; and that that mistake was corrected in 1951 by the public acts of that year treating all types of cities the same. He reasoned that the new action was taken to avoid absurd results and indicated that the whole formula was absurd, ambiguous and unworkable in some cases of annexation. Under the theory that a statute which is of doubtful meaning and ambiguous opens the door to a judicial determination of 'the legislative intent, the court proceeded to hold .that the ratio of the division of the personal property in this case is the ratio of the present law, that is, the part annexed to the entire township,. and not the part annexed to the remaining portion of the township.

---

* See CL 1948, § 123.1 (Stat Ann 1958 Rev § 5.2221); also, then in force, CL 1948, § 353.19 (Stat Ann 1953 Rev § 15.425).—Reporter.

While the rule as stated by the chancellor is correct as to the power of the judiciary to properly interpret ambiguous statutes and determine the legislative intent, such law must actually be ambiguous or of doubtful meaning. The mere fact a statute appears impolitic or unwise is not sufficient for judicial construction but is a matter for the legislature. *Yearnd* v. *Northern Insurance Company of New York,* 245 Mich 566.

The wording as to the division of personal property was placed in section 14 of the home-rule act at the time the legislature amended the section to include the division of the personal property of townships, which had not been subject to division prior to the adoption of the amendatory act, PA 1931, No 233. It is clear the legislature must have intended a different division in the case of personal property from what it intended with respect to the proceeds of the sale of the township's real property and the division of the township's indebtedness and liabilities.

No ambiguity in wording or meaning exists in the statutory provision now before the Court which would require judicial interpretation and construction. As stated in *Melia* v. *Employment Security Commission,* 346 Mich 544, 561:

"The duty of the Court is to interpret the statute as we find it. The wisdom of the provision in question in the form in which it was enacted is a matter of legislative responsibility with which courts may not interfere."

In the same case the Court further said (p 562):

"The cardinal rule of statutory construction is to ascertain and give effect to the intention of the legislature. If the language of a statutory provision is unambiguous, the intent must be determined accordingly."

A statute is not open to construction as a matter of course, but only where the language used in the statute requires interpretation—where it is ambiguous or where 2 or more constructions can be placed upon it, where it is of such doubtful or obscure meaning that reasonable minds might be uncertain or disagree as to its meaning. "A plain and unambiguous statute is to be applied, and not interpreted, since such a statute speaks for itself, and any attempt to make it clearer is a vain labor and tends only to obscurity." 50 Am Jur, Statutes, § 225, p 207.

The express wording of the statute in this case does not fall within the above provisions so as to justify judicial interpretation. Certainly it is plain, unambiguous and not subject to different interpretations by 2 reasonable minds. It is clear, definite, and would be easily understood by even those not trained in the law. The language of this statute, therefore, leaves no room for judicial construction. *In re Merrill,* 200 Mich 244; *City of Grand Rapids* v. *Crocker,* 219 Mich 178; *City of Detroit* v. *Township of Redford,* 253 Mich 453; *Detroit Trust Co.* v. *Hartwick,* 278 Mich 139; *People* v. *Powell,* 280 Mich 699 (111 ALR 721); *Detroit Edison Co.* v. *Secretary of State,* 281 Mich 428; *In re Chamberlain's Estate,* 298 Mich 278; *In re Gay's Estate,* 310 Mich 226; *Geraldine* v. *Miller,* 322 Mich 85; *Knapp* v. *Palmer,* 324 Mich 694; *Van Antwerp* v. *State,* 334 Mich 593; *Mercy Hospital* v. *Crippled Children Commission,* 340 Mich 404; *Bartkowiak* v. *Wayne County,* 341 Mich 333; *School District No. 9, Pittsfield Township, Washtenaw County* v. *Washtenaw County Board of Supervisors,* 341 Mich 388; *Big Bear Markets of Michigan, Inc.,* v. *Liquor Control Commission,* 345 Mich 569.

No intent may be imputed to the legislature in the enactment of a law other than such is supported by the face of the law itself. The courts may not specu-

late as to the probable intent of the legislature beyond the words employed in the act.

Nowhere in the statute under consideration did the legislature, by words or any other manner, provide for a different rule of construction or express an intention to apply any other ratio than the one affirmatively and clearly expressed in the wording of the statute.

The claim of defendant that since plaintiff has chosen an equity court to try the case the question presented should be considered from an equitable viewpoint, and that the division under the statute is grossly inequitable, is not effective. Courts of equity, as well as of law, must apply legislative enactments in accord with the plain intent of the legislature. *St. Helen Resort Association, Inc.,* v. *Hannan,* 321 Mich 536. See, also, *G. F. Sanborn Co.* v. *Alston,* 153 Mich 456.

An argument that a statute as construed may, in certain instances, work great hardship is one that should be addressed to the legislature rather than the court. *Nieminen* v. *Isle Royale Copper Co.,* 214 Mich 212.

A question with respect to the constitutionality of this section of the statute is raised. Defendant contends it is in violation of due-process and equal-protection provisions of the State Constitution[*] and the United States Constitution[†] in that it is arbitrary, capricious and unreasonable in the classification of home-rule cities as compared with other cities or municipal corporations and real property and indebtedness and liabilities in a division upon annexation of part of a township.

Ordinarily it must be assumed there was a sound basis in the reason for the legislature's classification until the contrary is shown, and one who assails

---

[*] Mich Const 1908, art 2, §§ 1, 16.—REPORTER.

[†] US Const, Am 14; § 1.—REPORTER.

such classification must carry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary. *People* v. *Zimberg,* 321 Mich 655; *In re Phillips,* 305 Mich 636; *Naudzius* v. *Lahr,* 253 Mich 216 (74 ALR 1189, 30 NCCA 179). This the defendant has failed to do. For these reasons, the trial judge reached an erroneous conclusion.

The act being clear, the correct ratio, so far as the division of personal property is concerned, is:

$$\frac{\$\ 5,072,592}{\$15,183,060.}$$

The second question appears to be one of whether any part of the Lansing township west side water supply system constitutes personal property and is subject to a division.

The township water supply system lies wholly without the annexed territory, with the exception of certain mains, pumps, valves, fittings and leaders which lie in the territory annexed. Also involved in the dispute were funds in the bank. This system was financed by the sale of revenue bonds under PA 1933, No 94, as amended (CL 1948, § 141.101 *et seq.* [Stat Ann 1958 Rev § 5.2731 *et seq.*]); and is a self-liquidating water system installed at the expense of the property owners to be served. The ordinance which authorized the sale of the bonds provides:

"Sec. 5. Said bonds shall not be a general obligation of the township of Lansing, and shall not be an indebtedness of said township within any State constitutional provision or statutory limitation, but shall be payable solely from the revenues derived from the operation of said water supply system (including as hereinbefore stated the improvement constructed hereunder and all extensions and additions thereto within said west side area) and to secure the payment of the principal of and interest

on said bonds, there is hereby created a first lien upon the whole of the said revenues, subject only to prior payment of administrative, operating and necessary maintenance expenses, to and in favor of the holders of said bonds and the coupons pertaining thereto, which lien shall continue until the payment in full of the principal of and interest on said bonds."

It is the contention of the defendant township of Lansing that the right of a municipality in a water system installed at the expense of the property owners to be served is not such a property right as should be considered in adjusting under the applicable statutes property rights of the respective municipalities incident to annexations.

It is the contention of plaintiff city of Lansing that the water system is personal property, that even water mains laid in a public street are regarded as personal property, and is subject to a division between defendant township and the plaintiff city.

In Michigan, by express statutory provision, water mains are to be considered personalty for taxation purposes. *City of Grand Haven* v. *Grand Haven Waterworks,* 119 Mich 652.*

There is no question but what this Court has for numerous purposes held that water mains constitute personal property rather than realty. However, in this instance it is not necessary to reach this question since the chancellor correctly held that this type of waterworks system is a trusteeship not subject to division as personal property between the township and city on annexation. The township acts as a trustee in the operation of the system. The system and its appurtenances do not belong to the township but is rather trust property held for the benefit of the people of the township.

* See, currently, CLS 1956, § 211.8, subd 11 (Stat Ann 1950 Rev § 7.8, subd 11).—REPORTER.

The question presented here was before the Court in the case of *Township of Royal Oak* v. *City of Ferndale,* 309 Mich 458. Plaintiff, city of Lansing, contends that the instant case differs from the *Township of Royal Oak Case* in that the water mains in the *Royal Oak Case* were installed by subdividers and private owners. However, subsequent to this installation, Royal Oak township, by proper ordinance, created and thereafter operated a water supply system, taking over the water system of the township, and proceeded to make additions thereto, bonding for the purpose of extending and improving the water system in the annexed territory. Justice NORTH, writing for the Court, therein said (pp 466, 467):

"Under such circumstances we do not think it can be said with accuracy that the water system when installed became the property of the township in the sense that it was the absolute beneficial owner of the same. Nor would such absolute ownership pass to another municipality incident to subsequent annexation of the territory served. In so stating we are mindful of the right of a municipality to encumber its water system by issuing revenue bonds, but such right is derived purely from statutory provisions. * * * The apparent result is that the right of the municipality in whose streets water mains are laid at the expense of property owners to be served is that of a trustee which possesses and controls the system thus established subject to the beneficial interest of the property owners to be served."

Justice NORTH goes on to say (p 468):

"Nor do we think that the rights of a municipality in a water system installed at the expense of the property owners to be served is such a property right, either real or personal, as should be considered

in adjusting under the applicable statutes property rights of the respective municipalities incident to annexations."

Under the circumstances outlined in the instant case, the court was correct in holding that the waterworks system, being trust property, is not subject to division between the township and the city on annexation.

The third question to be decided involves an interpretation of the fire-station contract. The so-called Carpenter contract was executed on August 26, 1949, and was between a contractor and the township of Lansing. It provided for the building of 4 fire stations in the township for the total price of $88,167. The work was to be substantially completed within 120 calendar days and to be started immediately. The pertinent provisions of the written contract were as follows:

"Witnesseth, that the contractor and the owner for the consideration hereinafter named agree as follows:

"Article 1. Scope of the work—The contractor shall furnish all of the materials and perform all of the work shown on the drawings and described in the specifications entitled

"Fire stations for township of Lansing, Ingham county, Michigan, prepared by Manson & Carver, registered architects acting as and in these contract documents entitled the architect; and shall do everything required by this agreement, the general conditions of the contract, the specifications and the drawings.

"Article 2. Time of completion—the work to be performed under this contract shall be commenced immediately, and shall be substantially completed within 120 calendar days.

"Liquidated damages will be granted to the owner in accordance with article 2, page 5, of the specifica-

tions as modified by notice to bidders No. 1 and No. 2.  ($10 per day per station to substantial completion.)

"Article 3.  The contract sum—The owner shall pay the contractor for the performance of the contract, subject to additions and deductions provided therein, in current funds as follows:

"Eighty-eight thousand, one hundred sixty-seven dollars ($88,167).

"Where the quantities originally contemplated are so changed that application of the agreed unit price to the quantity of work performed is shown to create a hardship to the owner or the contractor there shall be an equitable adjustment of the contract to prevent such hardship.

"Article 4—Progress payments—The owner shall make payments on account of the contract as provided therein, as follows:

"On or about the last day of each month 85% of the value, based on the contract prices, of labor and materials incorporated in the work and of materials suitably stored at the site thereof up to the 25th day of that month, as estimated by the architect, less the aggregate of previous payments; and upon substantial completion of the entire work, a sum sufficient to increase the total payments to 95% of the contract price.

"Article 5.  Acceptance and final payment—Final payment shall be due 30 days after final inspection of the work provided the work be then fully completed and the contract fully performed.  Before issuance of final certificate the contractor shall submit evidence satisfactory to the architect that all pay rolls, material bills, and other indebtedness connected with the work have been paid.  If after the work has been substantially completed, full completion thereof is materially delayed through no fault of the contractor, and the architect so certifies, the owner, shall upon certificate of the architect, and without terminating the contract, make payment of the balance due for that portion of the work fully

completed and accepted. Such payment shall be made under the terms and conditions governing final payment, except that it shall not constitute a waiver of claims."

The answer to the question presented rests basically on the issue of whether this building and construction contract was entire or divisible. If deemed to be entire, then, since the township was indebted for the full amount of the contract on the date of annexation, the city must pay its proportionate share as provided by statute. On the other hand, if it is said the contract is severable or divisible the city would only be liable for that part of the contract completed on the date of annexation.

Plaintiff contends it is either liable for nothing at all on this contract, or, if liable, such may not exceed the amount of liability due on the contract at the time of annexation. It alleges that it is not liable at all because the contract was not completed on the date of annexation and, therefore, the township had no indebtedness on the contract at date of annexation which the city was required to assume as its proportionate share.

The city enumerates numerous reasons why it feels the contract was not an entire one, and, not having been performed, the township had no obligation at the time of annexation.

Defendant, township of Lansing, contends the indebtedness was created on the date the contract was executed and, since it was an entire contract, plaintiff must bear its proportionate share of the liability.

The chancellor agreed with the defendant, township of Lansing. In this, we think, he was correct.

In 9 CJ, Building and Construction Contracts, § 45, pp 713, 714, is stated the following:

"Entire and divisible contracts. As in other contracts, the intention of the parties, as gathered from

the circumstances of the case and from the subject matter of the contract, controls in determining whether a building and construction contract is entire or divisible; and in construing contracts as entire or divisible, it has been said that the law is guided by a respect to general convenience and equity, for this is the construction which it must be supposed the parties intended should be given.

"Entire contracts. Thus, where the contract is for the construction of an entire work or structure for a fixed compensation, it is considered as entire and not divisible, especially where it is stipulated that the compensation is not to be paid until the work or structure is completed. So, although the contract calls for the performance of several items, if the compensation is not apportioned among the several items, but provides for a fixed sum for the work as a whole, the contract is regarded as entire; and this has been held true, although the amount to be paid is made up by stating the estimated cost of each item and then adding the whole together, without any agreement to pay by items; and if the contract is for a work as a whole, it will not be rendered divisible by the fact that the compensation is payable in instalments as the work progresses, as where payments are made periodically on an estimate of the amount of work done, or as the work reaches certain stages of completion.

"Divisible contracts. Of course if the contract clearly shows an intention of the parties that it should be considered as divisible, as regards the several items to be performed, or as regards the several stages of an entire work, it will be so construed by the courts; and, as a general rule, where the contract requires the performance of several separate and distinct items, the price for which is apportioned to each item, or where the price is clearly and distinctly apportioned to the different parts of but one item, the contract will be regarded as divisible. Thus the contract has been held to be divisible, where it provides for the payment of

definite sums at different periods before the completion of the entire work, or where it is to do several buildings at so much per building. By agreement, express or implied, the parties may render divisible a contract which in the first instance was entire."

See, also, 6 RCL, Contracts, § 246, p 858, and 17 CJS, Contracts, §§ 331–336, pp 785–791, for further discussions on this subject.

As a general rule, a contract is entire when, by its terms, nature and purpose, it contemplates that each and all of its parts are interdependent and common to one another and to the consideration, and is severable when, in its nature and purpose, it is susceptible of division and apportionment.

The singleness or apportionability of the consideration appears to be the principal test. The question is ordinarily determined by inquiring whether the contract embraces one or more subject matters, whether the obligation is due at the same time to the same person, and whether the consideration is entire or apportioned. If the consideration to be paid is single and entire, the contract must be held to be entire, although the subject thereof may consist of several distinct and wholly independent items. 12 Am Jur, Contracts, § 317, pp 872, 873.

This Court has determined the question of whether a contract was severable or entire in the following cases. The first case illustrates a severable contract: the subsequent ones what constitutes an entire contract. In *Barnard* v. *McLeod,* 114 Mich 73, it was held a contract to erect 5 houses, described on lands to be designated, to be completed at a fixed time, for a definite price for each house, is a severable contract. In the case of *Blumrosen* v. *Silver Flame Industries, Inc.,* 334 Mich 441, it was held that a written contract, whereby a corporation agreed to sell to an individual ceiling-suspended furnaces and oil-storage

tanks, and to install such heaters and tanks in a block of stores owned by the individual for a specified gross sum payable in specified instalments, was indivisible and rescission by the individual was required to be *in toto* and not partial. The case of *People, for use of McDonell,* v. *Fidelity & Deposit Co. of Maryland,* 232 Mich 238, involved a contract to do excavation and backfilling upon a certain project at specified prices per cubic yard. The contract in that case contained the following clause (p 241):

"'Parties of the second part to be paid every 2 weeks on estimates of work done the previous 2 weeks on backfill and excavation; final estimate to be paid within 2 weeks after work is completed.'"

The Court held the contract was entire and not apportionable.

The construction work in this contract is not divided. The payments are contingent on the progress of the work, on the whole or entire contract, not on the completion of a specific portion of the work. The price to be paid is not so much per unit, but, rather, a total price for all 4 fire stations. The contract contained a clause for liquidated damages in favor of the township in the event the contractor failed to complete the contract within 120 days. No provision was made with respect to completion of individual units. Reading the entire contract, its terms, nature and purpose, it is evident that it was contemplated and intended this was to be an entire contract. The obligation and duty to pay was an outstanding obligation of the township on November 12, 1949, the annexation date, and, therefore, the plaintiff city must bear its proportionate share of said indebtedness as provided by statute.

It is to be noted that on the 12th day of November, 1949, the township had paid $27,049.95 on the contract. The total actual cost of the contract was

$87,154.72. Therefore, the city shall assume its statutory portion of the full contract price.

Since we hold the contract was entire and complete and the liability existed as of November 12, 1949, the claimed violation of article 10, § 12, of the Michigan Constitution (1908) is not involved.

The fourth question deals with whether or not the at-large drain taxes of 1949, 1950, and 1951, amounting to $29,156.62, are a liability of the township at the time of annexation and, therefore, a part of the indebtedness of which the city must bear its proportionate share.

Plaintiff city did not appeal from the decision of the court on this question. However, a cross appeal was taken by defendant township.

The chancellor found that the drain tax for these years was not an indebtedness of the township subject to a division on annexation. In so holding, he held that PA 1949, No 146 (CLS 1954, § 270.3 [Stat Ann 1952 Rev § 11.89]),* was unconstitutional in that it contravenes article 10, §§ 9 and 12 of the Michigan Constitution (1908). The court held that the at-large drain taxes are not primarily an obligation of the township, but, rather, of the property owners of the drain district upon whose property the tax was levied. The debt is that of the taxpayer owing the county, not the debt of the township as a whole, and if payment is made out of the contingent fund of the township of the drain at-large taxes, then public funds to pay private obligations would be used contrary to the State Constitution.

In order to properly arrive at a decision of this matter, a history of proceedings taken by the drain commissioner, township board, and other public authorities must be reviewed.

_____

* Repealed by the drain code of 1956, PA 1956, No 40.—REPORTER.

Under the drain code in effect the drain commissioner sets forth the date of the letting of the contract, where a contract is to be let, the time within which assessments determined can be paid, the total cost of the drain, and the amount assessed against the township at large.

The drain commissioner testified that he prepared a special assessment roll for each drain; that he determined the percentages of benefits that each person affected by the drain and their property should pay; that at the same time he determined the percentages which should be assessed to the township at large.

It is admitted by the defendant township that until PA 1949, No 146, became effective, the statutes of this State contemplated in reference to the drain laws that the drain commissioner would determine the benefits that each individual piece of property within the drainage district should be assessed as benefits toward the cost of the drain. At the same time, the drain commissioner would determine the amount that the township would benefit at large and determine the tax that the township, because of township benefits at large, should pay. It then became the duty of the supervisor to spread upon the taxable property of the township, a tax against each individual piece of property which would produce the amount that the drain commissioner had determined the township should pay at large.

Under CLS 1954, § 270.3 (Stat Ann 1952 Rev § 11.89) the township drain tax at-large is merged with the regular township tax and becomes a part thereof. And that portion of the merged spread at-large township drain tax cannot be returned as unpaid separately from the township tax proper. Under CL 1948, § 270.5 (Stat Ann 1952 Rev § 11.91), "All taxes levied under the provisions of this act, with all lawful costs, interest and charges, shall be

and remain a perpetual lien upon the lands upon which they are assessed, and a personal claim against the owner or owners of such lands until they are paid."

It would appear that the township-at-large drain assessments when levied according to the law in effect prior to PA 1949, No 146, are the debt, not of the township, but of the property owner on whose property the assessments are levied. Payment out of the general or contingent fund of the township of the amount of at-large drain tax, which the then statutes required to be levied on the taxable property of the township, is, in effect, payment of private obligations with public funds.

The municipal funds of a township are subject to disposition only in accordance with statutory authority. The inhabitants of a township, some of whom pay taxes under the general tax law and some of whom do not, are all interested in the legal utilization thereof. A township's contingent or general fund is not the property of taxpayers whose names appear on the township assessment rolls, but the property of all the inhabitants of the township. If this is so, the use to pay the debts of a portion of the inhabitants, to wit, the taxpayers whose names appear on the tax assessment rolls, would be using general township funds to discharge the private debts of township taxpayers. To use moneys from the general fund to pay a township-at-large drain assessment would clearly be the use of such funds as a substitute for funds required by law to be raised by taxes levied on the property of the township. Therefore, prior to the effective date of PA 1949, No 146, amending CL 1948, § 270.3 (Stat Ann § 11.89), contingent or general fund moneys could not be used to pay at-large drain assessments.

PA 1949, No 146, merely added an alternative method by which the legislative body of the county,

township, city or village may in any year provide for the payment of at-large drain taxes from the general or contingent fund of such municipality.

It is the plaintiff's position that after the 23d day of May, 1949, the effective date of PA 1949, No 146, the defendant township had the right to pay the drain tax assessed against the township at large under the provisions of Act No 146 from the general or contingent fund of the township, but only upon affirmative action by the township board.

The pertinent part of Act No 146, as it is here involved, reads as follows:

"That in lieu of the addition of such tax to the county, township, city or village tax, the legislative body thereof may in any year provide for the payment thereof from the general or contingent fund of such county, township, city or village."

It is the contention of defendant township that the township board did take such action. The city contends it did not.

Supervisor Wilcox testified, in substance, that he had been supervisor of the township since 1943; that he had been township clerk for 5 years previous thereto; that he had resided in and owned real estate in the township since 1913; that to his knowledge since he became a property owner the drain tax at large had always been paid from the general fund of this township. Mr. Wilcox further testified that in the course of his work he prepared a budget which he presented to the tax allocation board of Ingham county; that before the budget was presented to the tax allocation board, he presented it to the township board on June 7, 1949, and the township board approved the budget; that such proposed budget contained an item of $22,500 for the drain tax at large; that subsequent to June 7, 1949, when the township board approved the pro-

posed budget, the supervisor presented to the tax allocation board of Ingham county said proposed budget.

Exhibit 24 was a report of the committee on apportionment and assessment rolls of the Ingham county board of supervisors. It contained a statement that the "several supervisors be, and are hereby ordered and directed to assess the several sums set forth in this schedule opposite the names of their township." Said report contained an item for drain tax at large in the amount of $23,601.94. This was a directive that this tax must be raised, and in the event the board did not choose to pay the same from the general or contingent fund, the supervisor had to spread the tax. No further action was taken, no assessment was made by the supervisor until January 17, 1950, when a claim was presented against the township for the at-large drain taxes that were to be paid by the township at large for the year 1949. This claim was allowed January 24, 1950, and was paid by warrant and township treasurer's check, both dated January 25, 1950. If the township officers were aware of the effect of amendatory act PA 1949, No 146, they did not take sufficient steps to properly bring the payment of the at-large drain taxes under this act. Therefore, it is not necessary for us to consider the question of whether this act is constitutional or not. It follows that the at-large drain taxes for the years 1949, 1950, and 1951 were not a liability of the defendant township on November 12, 1949, and subject to a division between the defendant township and the plaintiff city under the provisions of section 14 of PA 1909, No 279 (CL 1948, § 117.14 [Stat Ann 1949 Rev § 5.2093]), then in effect.

A decree in accordance with the foregoing opinion will be entered in this Court. Neither party having prevailed in the entirety, no costs will be allowed.

Dethmers, C. J., and Carr, Kelly, Smith, Black, Edwards, and Voelker, JJ., concurred.