GOODRIDGE v YPSILANTI TOWNSHIP BOARD (AFTER REMAND)

Docket No. 195973. Submitted August 28, 1997, at Lansing. Decided December 23, 1997, at 9:10 A.M. Leave to appeal sought.

Jerry T. Goodridge petitioned the Washtenaw Circuit Court for judicial review of a decision by the Ypsilanti Township Civil Service Commission to sustain the termination by the Ypsilanti Township Board of his employment as Ypsilanti fire chief for malfeasance involving a fraudulent civil service eligibility list of prospective fire fighters. The court, Ross W. Campbell, J., affirmed. The Court of Appeals, TAYLOR, P.J., and W. G. SCHMA, J. (GRIFFIN, J., dissenting), reversed, holding that the charges were void ab initio because they were not brought within ninety days of the alleged violations, as required by the fire fighters' and police officers' civil service act, MCL 38.514; MSA 5.3364, and remanded for reinstatement of the petitioner, if otherwise qualified. 209 Mich App 344 (1995). The Supreme Court reversed and remanded for reconsideration, holding that charges are timely under MCL 38.514; MSA 5.3364 if they are filed within ninety days of the time the employer learned, or reasonably should have learned, of the alleged misconduct. 451 Mich 446 (1996). The Court of Appeals remanded the case to the Ypsilanti Township Civil Service Commission so that the commission could apply the test announced by the Supreme Court. Unpublished opinion per curiam, issued September 8, 1996 (Docket No. 194973). The commission determined that the Ypsilanti Township supervisor reasonably should have known of the petitioner's misconduct more than ninety days before the petitioner was charged with misconduct.

After remand, the Court of Appeals held:

The commission's determination that charges were not filed within ninety days of when the township supervisor reasonably should have known of the alleged misconduct is adequately supported by the record. The commission's order that petitioner, before reinstatement, undergo testing by the Institute of Public Safety Personnel to determine whether he is qualified to act as fire chief is reasonable.

Affirmed.

GRIFFIN, J., dissenting, stated that the finding of the Ypsilanti Township Civil Service Commission that the township supervisor reasonably should have known of the petitioner's misconduct within ninety days before the petitioner was charged is not supported by substantial evidence on the whole record. It was not reasonable for the commission to infer that because the township supervisor had been alerted to a problem with the civil service list, he reasonably should have known of the petitioner's involvement in the fraudulent list inasmuch as the list had been prepared by the commission. The commission's most recent decision should be reversed, and the circuit court order that sustained the termination of the petitioner's employment should be affirmed.

CIVIL SERVICE — FIRE FIGHTERS' AND POLICE OFFICERS' CIVIL SERVICE ACT — TIMELINES OF MISCONDUCT CHARGES.

A charge of misconduct by a fire fighter or police officer is timely filed pursuant to the fire fighters' and police officers' civil service act if made within ninety days of the time the employer learned, or reasonably should have learned, of the alleged misconduct (MCL 38.514; MSA 5.3364).

*William G. Povlitz,* for the petitioner.

*McLain & Winters* (by *William Douglas Winters* and *Angela B. King*), for the respondent.

AFTER REMAND

Before: TAYLOR, P.J., and GRIFFIN and HOEKSTRA, JJ.

TAYLOR, P.J. Petitioner's employment as Ypsilanti Township's fire chief was terminated by respondent Ypsilanti Township Board as a result of a finding of misconduct.[1] The circuit court affirmed the termination of petitioner's employment. This Court,[2] over Judge GRIFFIN's dissent, reversed the termination of petitioner's employment because the charges of misconduct had not been filed within the ninety-day stat-

---

[1] Criminal charges were never filed against plaintiff.

[2] Judge HOEKSTRA has been substituted for Judge W. G. SCHMA for the postremand proceedings.

utory period. *Goodridge v Ypsilanti Twp Bd*, 209 Mich App 344; 529 NW2d 665 (1995). The Supreme Court reversed, stating that charges are timely if they are filed within ninety days of the time the employer learned, or reasonably should have learned, of the alleged misconduct. *Goodridge v Ypsilanti Twp Bd*, 451 Mich 446, 456; 547 NW2d 668 (1996). The Supreme Court remanded the case to us for further consideration in light of its opinion. *Id.*

The Supreme Court's remand required us to determine whether charges were filed against petitioner within ninety days of the time the employer learned or reasonably should have learned of the alleged misconduct. Our original opinion stated that the fraud occurred in April of 1986 and that it was discovered in July of 1986. Petitioner was charged with misconduct by way of an October 16, 1986, letter. Ninety days before October 16, 1986, was July 18, 1986. Thus, we have been instructed to determine whether petitioner's employer had actual knowledge on or before July 18, 1986, or reasonably should have learned of the alleged misconduct on or before July 18, 1986.

To facilitate answering this question, we remanded this matter, while retaining jurisdiction, so that the Ypsilanti Township Civil Service Commission could apply the new test announced by the Supreme Court in the first instance. *Goodridge v Ypsilanti Twp Bd*, unpublished opinion per curiam, issued September 3, 1996 (Docket No. 195973). Thereafter, the commission issued a unanimous opinion dated August 5, 1997, holding that the principal executive officer of Ypsilanti Township reasonably should have known of petitioner's misconduct before July 18, 1986. We now,

pursuant to the instruction in the Supreme Court's remand, affirm the commission's recent opinion because it is adequately supported in the record.[3] Because the charges cited as the basis for terminating petitioner's employment were not filed within the ninety-day period, the charges were void. MCL 38.514; MSA 5.3364 (all charges shall be void unless filed within ninety days of the violation).

In our original opinion, we ordered petitioner reinstated if he was otherwise qualified and further held that petitioner was not entitled to back pay. 209 Mich App 354. Nothing in the Supreme Court's opinion changed these holdings. The commission's most recent opinion "subject to guidance from the Court of Appeals" ordered petitioner to undergo testing under the supervision of the Institute of Public Safety Personnel to determine whether he is "otherwise qualified" to act as fire chief for Ypsilanti Township. We approve of this directive, our original opinion indicated that petitioner was to be reinstated if "otherwise qualified," *id.* at 354, and find it reasonable given the fact that petitioner has not been fire chief for almost ten years. Petitioner shall be reinstated upon the institute's finding that petitioner is qualified.

The August 5, 1997, opinion of the commission is affirmed.

HOEKSTRA, J., concurred.

---

[3] Contrary to the dissent, we find enough evidence, at least by inference, to sustain the commission's decision. The commission's decision satisfies the deferential review standard, *In re Payne,* 444 Mich 679; 514 NW2d 121 (1994), and does not permit the extensive fact finding that is at the heart of the dissent.

Griffin, J. (*dissenting*). Petitioner, Jerry T. Good-ridge, appeals as of right a circuit court order affirming the termination of his civil service employment as the fire chief of Ypsilanti Township. I would affirm.

I

More than ten years ago, petitioner, then fire chief of Ypsilanti Township, perpetrated a fraud against the citizens of Ypsilanti Township. In April 1986, petitioner conspired with members of the Ypsilanti Township Civil Service Commission (YTCSC) to falsify a list of the most qualified applicants for four new firefighter positions. On April 23, 1986, the fraudulent list was certified by the YTCSC and thereafter submitted to Ypsilanti Township Supervisor Ron Allen. The top four applicants, as certified by the YTCSC, were thereafter hired as firefighters by the township. It is undisputed that, at the time of hiring, Supervisor Allen had no knowledge of the fraud committed by petitioner and the YTCSC members.

On October 16, 1986, charges of neglect of duty, dishonesty, and misconduct were filed against petitioner. In a letter signed by Supervisor Allen and six members of the township board, petitioner was charged as follows:

As the result of an investigation into the irregularities surrounding the written Civil Service examination for firefighters in November of 1985, the conducting of the oral interviews in January, February and March of 1986 and the establishment of the eligibility list for the hiring of firefighters in April of 1986, it has been determined by the Ypsilanti Township Board that you are guilty of certain acts of neglect of duty, dishonesty and misconduct. The facts surrounding your involvement in these matters were first

reported to the Township Supervisor on July 23, 1986 and have been the subject of subsequent investigations since then by the Washtenaw County Prosecutor's Office and the Township Attorney.

It is the determination of the Township Board that your commission of these acts requires the termination of your employment as Fire Chief. Therefore, pursuant to the provisions of the Michigan Civil Service Act, the following charges are filed against you and with the Ypsilanti Township Civil Service Commission:

1. That on or about April 21, 1986, you met with Civil Service Commissioner Ronnie Peterson and discussed altering, with no basis, the Civil Service eligibility list that had already been prepared by the Civil Service Commission. That you aided Mr. Peterson in preparing an altered list that contained names of individuals who had never taken the written test nor the oral exam to be eligible for hire. That you were aware that these alterations were made and had your secretary type up the new but fraudulent list. These actions were never reported to the Fire Commissioner or any other Township Official as the responsibilities of your position would require.

2. That you personally took this fraudulent eligibility list to the home of Civil Service Commissioner Lester Wallen and attempted to get him to sign this fraudulent list so that it would become the official list for the hiring of firefighters.

3. That Mr. Wallen informed you at that time that the list you had presented him was fraudulent as it contained names of individuals to be hired who had never taken the written or oral exam. That you chose to ignore this warning, never investigated this matter further, nor informed the Fire Commissioner or any other Township Official of this obvious attempt to falsify the eligibility list.

4. That on April 22, 1986, you were involved in a meeting in which Commissioner Peterson, Commissioner Wallen, and Police Coordinator Owings were also present. At this meeting the fraudulent list was discussed and the possible criminal acts involved were discussed. You, however, never reported this meeting to any Township official, nor your

involvement in this fraudulent conduct until after Mr. Wallen made a report of your activities on July 23, 1986.

5. That on October 1, 1986, as part of the Township Board's investigation by a Board Subcommittee you were asked certain questions concerning your involvement in the above matters. In response to these questions, you materially misrepresented to this Township Board subcommittee certain facts concerning your awareness that the list given to you by Commissioner Peterson was fraudulent; what Commissioner Wallen told you when you tried to get him to sign the fraudulent list; the subjects discussed in the meeting on April 22, 1986 and the warning Commissioner Wallen gave at this meeting about possible illegal action involving altering and preparing a fraudulent list.

The above acts of dishonesty, neglect of duty and acts of nonfeasance merit severe disciplinary action. For these reasons, we are hereby filing these charges with the Civil Service Commission requesting the termination of your employment for the above reasons.

Between December 1986 and the spring of 1987, all three members of the YTCSC who certified the fraudulent list resigned from the civil service commission. One YTCSC member, Ron Peterson, was convicted for his role in the fraud. Following the resignations, an entirely new panel was appointed to the Ypsilanti Township Civil Service Commission. The new commission consisted of Joe E. Hall, Robert Pifer, and Roger Simpson. The newly constituted YTCSC convened a hearing on the charges against petitioner, which commenced on May 11, 1987. In the ensuing months, Hall, Pifer, and Simpson heard and saw the live witnesses and received over 2,000 pages of testimony. On December 8, 1987, the YTCSC unanimously sustained counts one, two, three, and four of the charges filed by Supervisor Allen against petitioner. The YTCSC panel unanimously affirmed the termination

of Goodridge's employment as fire chief. The YTCSC "Opinion and Order Sustaining the Termination of Respondent's [now petitioner's] Employment" states in pertinent part as follows:

> This Commission has heard the presentation of evidence, oral and documentary, at the hearing of this matter, which commenced on May 11, 1987 and concluded on November 11, 1987, has had the opportunity to assess the demeanor and credibility of the numerous witnesses who testified, and has carefully deliberated as to the charges raised by the October 16, 1986 letter of termination by the Township official with removal authority, Ron Allen. For the reasons which follow, we sustain the action of the Township Supervisor in terminating the employment of Respondent [Goodridge].

> \*     \*     \*

> With respect to the first charge . . . we find that the evidence amply sustains the Township Supervisor's charge that Respondent [Goodridge] encouraged and aided Civil Service Commissioner Ronnie Peterson in preparing an altered list for hiring of firefighters. Indeed, perhaps the strongest evidence of respondent's involvement is found in admissions by Respondent [Goodridge] himself. . . .

> \*     \*     \*

> We find that it is indisputable that Respondent [Goodridge], as charged, participated in the preparation of an altered hiring list. . . .

> \*     \*     \*

> We find that charge number three is supported by the evidence, and, as stated in our concluding remarks addressed to the first charge, that *Respondent [Goodridge] failed to investigate the situation or to report it to his superior, Ron Allen, or to any member of the Ypsilanti Township Board.*

\*     \*     \*

We feel that the testimony of Harold Owings and Lester Wallen clearly establish that serious problems with the hiring lists were discussed at that meeting, at which Respondent [Goodridge] was present . . . *and that he [Goodridge] failed to take appropriate action by notifying the Township Supervisor or the Township Board of the precise nature of the difficulties.*

\*     \*     \*

Respondent knew that a confrontation existed with respect to the matter of firefighter eligibility lists, and he should have been concerned enough, in his capacity as Fire Chief, to report the meeting's content to his superior, Mr. Allen, or to members of the Township Board. [Emphasis added.]

At the hearing, the panel members, Hall, Pifer, and Simpson, heard Supervisor Allen testify that he first learned of Goodridge's involvement in the fraudulent hiring list on July 22, 1986. Allen's testimony in this regard was unrebutted.

II

On appeal to the circuit court, the decision of the YTCSC was affirmed. However, on further appeal, this Court reversed, holding that the charges were barred by the ninety-day statute of limitations of the firemen's and policemen's civil service act, MCL 38.514; MSA 5.3364. The majority construed the statute of limitations as not containing a discovery provision. *Goodridge v Ypsilanti Twp Bd*, 209 Mich App 344; 529 NW2d 665 (1995). [1] The Supreme Court reversed, holding that the charges are timely "if filed within

---

[1] After the reversal and remand by the Supreme Court, Judge HOEKSTRA was substituted for visiting Judge WILLIAM G. SCHMA.

ninety days of the time the employer learned, or reasonably should have learned, of the alleged misconduct." *Goodridge v Ypsilanti Twp Bd*, 451 Mich 446, 455-456; 547 NW2d 668 (1996). In so doing, the Court stated, "[W]e are persuaded that the statute should be interpreted in the manner in which it was understood to operate before the Court of Appeals decisions in these cases." *Id.* at 455. The Supreme Court remanded the case to this Court for further consideration in light of the opinion. Thereafter, we remanded to the Ypsilanti Township Civil Service Commission for further fact finding. In our opinion remanding to the YTCSC, we acknowledged that the record is clear that Supervisor Allen did not have actual knowledge of Goodridge's involvement in the conspiracy until July 22, 1986. However, the YTCSC was instructed to rule whether Allen reasonably should have learned of Goodridge's misconduct before the running of the statutory period of limitation on July 18, 1986:

> On the basis of the Supreme Court's opinion and order, we must determine whether charges were filed within ninety days [sic] of time the employer "learned, or reasonably should have learned[,]" of the alleged misconduct. Our original opinion stated that the fraud occurred in April of 1986, was discovered in July of 1986, and that petitioner was charged with misconduct via an October 16, 1986, letter. . . . Ninety days before October 16, 1986, was July 18, 1986. Thus, pursuant to the Supreme Court's directive, we must determine whether the employer had actual knowledge on or before July 18, 1986, or reasonably should have learned of the misconduct on or before July 18, 1986. We find it necessary to remand because the YTCSC did not utilize this test when it initially decided this case. The YTCSC did hold that Ron Allen, the township official with charging authority, did not have "actual knowledge" of the petitioner's claimed misconduct more than ninety days before

charges were filed on October 16, 1986 (apparently believing Allen's testimony that he did not become aware of any alleged improprieties by petitioner until July 22, 1986). Left unresolved under the new test announced by the Supreme Court is whether the employer "reasonably should have known" of the misconduct before July 18, 1996 [sic]. If so, the charges should have been dismissed.

We therefore remand this matter to the YTCSC for the resolution of this question within ninety days. [*Goodridge v Ypsilanti Twp Bd*, unpublished opinion per curiam of the Court of Appeals, issued September 3, 1997 (Docket No. 195973).]

Unbeknownst to us at the time of our remand, the composition of the Ypsilanti Township Civil Service Commission had again changed. By the time of the remand from this Court, the three civil service members who had "the opportunity to assess the demeanor and credibility of the numerous witnesses who testified" had been replaced. On remand, new YTCSC panel members, Gary Oxender, Jackie Mills, and Ralph Patterson, did not take any additional testimony but "reviewed the briefs and relevant portions of the testimony from the original hearings. . . ." Nevertheless, the 1997 YTCSC assessed the credibility of witnesses it had not seen or heard and made findings of fact. The 1997 YTCSC concluded that the charges brought against Goodridge were barred by the ninety-day statute of limitation because Supervisor Allen "reasonably should have known" of Goodridge's role in the YTCSC fraud before July 18, 1986. Contrary to the earlier decision of the YTCSC and the circuit court, the 1997 YTCSC ordered reinstatement of Goodridge as the Ypsilanti Township fire chief, as long as he is deemed to be physically qualified pursuant to the standards of the Institute of Public Safety Personnel.

III

Despite the unusual posture and circumstances of this case, we review the fact finding of the 1997 YTCSC under a deferential standard of review and will affirm if the decision is supported by substantial evidence. *In re Payne*, 444 Mich 679; 514 NW2d 121 (1994).

I have read and reviewed the record. After doing so, I would hold that the finding of the 1997 YTCSC that Supervisor Allen reasonably should have known of the misconduct of Jerry Goodridge before July 18, 1986, is not supported by substantial evidence on the whole record.

The 1997 YTCSC decision cites no evidence in the record that Allen should have known of petitioner's involvement in the fraud before July 18, 1986. Rather, the decision simply makes an inference that is neither supportable nor logical. Inferences made by administrative agencies are supported by substantial evidence only when "the inferences made [are] legitimate and supportable." *Payne*, (opinion by Boyle, J.) *supra* at 690-691, n 8. See also *McBride v Pontiac School Dist (On Remand)*, 218 Mich App 113, 123; 553 NW2d 646 (1996). Further, "substantial evidence" is defined as

> the amount of evidence that a reasonable mind would accept as sufficient to support a conclusion. While it consists of more than a scintilla of evidence, it may be substantially less than a preponderance. [*Payne, supra* at 692.]

The 1997 YTCSC infers that because Supervisor Allen was "alerted" to a "problem" with the civil service list before July 18, 1986, he should have known at that time of Goodridge's involvement in the fraud. Such an inference is not reasonable and not supported by the evidence. Because the hiring list was a *civil service*

*list* prepared by and *certified by the members of the* YTCSC, the reasonable inference should be that the "problem" involved the YTCSC, not Goodridge.

The testimony that the 1997 YTCSC deemed to be "credible in all regards" was that of Sergeant Susan K. Ledford of the Washtenaw County Sheriff's Department. However, testimony of Sergeant Ledford concerning the statute of limitations issue supports the position of the township, not petitioner. Sergeant Ledford testified that although Allen advised her that he was first alerted to a potential problem with the civil service hiring list on July 4, 1986, he also told her that he had no reason to know of Goodridge's involvement:

> *Commissioner Pifer:* . . . When you talked to Mr. Allen, did he ever indicate when he first became aware of problems with the hiring list?
>
> *The Witness* [Sergeant Ledford]: Yes, he did.
>
> *Commissioner Pifer:* When did he indicate he first became aware, to you?
>
> *The Witness:* On the date we interviewed him the first time, he stated that it was on or about the 4th of July when he first became aware of the irregularities in the hiring procedure.
>
> *Commissioner Pifer:* On or about the 4th of July?
>
> *The Witness:* Correct.
>
> *Commissioner Pifer:* Did he indicate what he became aware of on or about the 4th of July?
>
> *The Witness:* I believe he just stated that he became aware of certain irregularities by what he was hearing about the building.
>
> *Commissioner Pifer:* Was there any indication at that time that the Fire Chief had any involvement in that irregularities [sic] at that time?
>
> *The Witness:* I don't believe he stated it, sir. I can check my report and see if he—

*Commissioner Pifer:* Would you do that, please?

(The witness complies)

*The Witness:* According to my report, sir, it states in the second paragraph, at Mr. Allen's interview:

"Mr. Allen states that he first became aware of potential problems with the testing process or about the 4th of July 1986, through a conversation with Lester Wallen and Harold Owings.

At that time, Mr. Allen requested Harold Owings to conduct an investigation into the testing process."

* * *

*Q.* [Mr. Winters] . . . Now, as part of your initial perusal of some of the documents, you became aware that there was an allegation that Fire Chief Goodridge had transported an eligibility list, dated April 21, 1986, to the home of Commissioner Wallen who, upon reviewing that document, had voiced objections to that.

*A.* [Sergeant Ledford] That's correct.

*Q.* Is that true?

*A.* Yes, sir.

*Q.* Did you have that document with you when you interviewed Mr. Ron Allen?

*A.* Yes, sir, we did.

*Q.* And do you recall specifically asking him questions in regards to whether or not he was aware that Mr. Goodridge had been in possession of that document and had actually taken it to Lester Wallen's house requesting that he approve that document? Was that question asked of him?

*A.* Yes, sir, it was.

*Q.* What was his response to that question?

*A.* That he did not know that Mr.—or, that he did know that the allegations were made that Mr. Goodridge had taken that to Lester's house.

*Q.* The question was—and maybe you have to review your report to refresh your memory, if you have to.

Did you ask him as to whether or not he was aware that he had been in possession of that document?

*A.* I understand the question now. He told me, no, he did not know.

*Q.* What did he actually state to you, if you recall, in regards to the question so that we're not just talking generalities?

Was there a specific question and a specific response in regards to whether or not he had been aware that Chief Goodridge had taken this list over to Lester Wallen's house on April 21, 1986?

*A.* Sir, if you approve, I'll just read directly from my report as I quoted it there.

Mr. Allen replied to that question:

"No, I did not know. As a department head, it is not appropriate for Mr. Goodridge to have the list prior to it being posted or to be involved with developing the list."

*Q.* Now, was there any type of an explanation or qualification that accompanied that statement in regards to it not being appropriate for a department head to be involved with developing a list or even being in possession of it prior to it being posted?

*A.* Yes. We asked Mr. Allen to go step-by-step through the hiring procedure. And at the conclusion of detailing that very specifically for us, he stated that procedurally he has no input on the testing process or the eligibility list; and that it's the purpose of the Civil Service Commission and the reason it's set up is to separate and to free the hiring process for any influence by the supervisor or other department heads.

The testimony of former Township Police Coordinator Harold Owings is also supportive of the township's position that Supervisor Allen had no reason to know, prior to July 18, 1986, of Goodridge's participation in the conspiracy to falsify the civil service hiring list. Owings testified that on July 16, 1986, he received a computer printout from the Michigan Municipal League of the tests taken by the firefighter applicants. The Municipal League printout confirmed

that of the four applicants who had been certified as the most qualified by the YTCSC, one had failed the test and another had never taken the examination. As soon as these discrepancies were confirmed by the Municipal League printout, Owings went to Allen's office to inform the supervisor:

> *Q.* [Mr. Winters] Now, once you discovered or once it became apparent that there were two persons who actually had been hired, one of whom had failed the examination, one of whom had never taken the written examination, what did you do?
>
> *A.* [witness Harold Owings] Well, back up to the 16th. On July the 16th, after Mr. Wallen brought the computer printout in and we did the preliminary comparison of the eligibility list with the printout, he marched right over to Supervisor Allen's office, not so much as supervisor but as the fire commissioner, and Lester said, "As a civil service representative, I am reporting to the fire commissioner that there's discrepancies with the eligibility list."
>
> *Q.* Okay. That was done the same day that the documentation came in from the Michigan Municipal League?
>
> *A.* That was done probably within a half an hour.
>
> *              *              *
>
> *Q.* . . . . After Mr. Allen has been informed about the problem of July 16th, what happened next?
>
> *A.* After Mr. Wallen told Fire Commissioner Supervisor Allen about the list and the discrepancies, about—well, it wasn't ten or twenty—I'd say twenty minutes later, Mr. Allen come into my office and said, "What's going on with the Civil Service Commission and your investigation?" And I said, "All I got is right here." And I showed him the test results and the comparisons that we had done.
>
> *Q.* Had you been doing an investigation prior to that day?
>
> *A.* I had not personally, no.
>
> *Q.* But you were asked as to what was going on in regards to an investigation. Was he referring to it as your investigation or just to an investigation that—

*A.* Well, apparently what information I had, based on what Mr. Wallen had told me that day.

*Q.* Basically, what did you know about what was going on?

*A.* Right. And I give him the copy of the printout and the test scores and said, "Here's what it looks like." And at that time, he said, "Go ahead and investigate it. Do it as soon as you can and get back with me."

There is nothing in the testimony of Owings that would indicate that Supervisor Allen was alerted to the involvement of the petitioner Goodridge in the falsification of the civil service list.

Finally, the rambling testimony of T. R. Stumbo is of little significance other than to substantiate that on July 11 and July 17, 1986, Supervisor Allen was notified by another source of potential discrepancies with a civil service hiring list. Like the testimony of the other witnesses, Stumbo's testimony contains no evidence or reference to Goodridge's participation in the fraud. The testimony of the remaining witnesses likewise offers no support for the conclusion reached by the 1997 YTCSC.

In summary, after my thorough review of the voluminous record, I conclude that there is no substantial evidence on the whole record that Supervisor Allen learned or reasonably should have learned of the misconduct of petitioner before July 18, 1986. As noted by the testimony of Supervisor Allen and of Sergeant Ledford, petitioner was prohibited from participating in the preparation and certification of the civil service list. Petitioner's participation in the conspiracy to falsify the civil service list was unexpected and unforeseeable by any reasonable interpretation of the evidence. See, generally, *MERC v Detroit Symphony*

*Orchestra, Inc,* 393 Mich 116; 223 NW2d 283 (1974), and *Hunn v Madison Heights,* 60 Mich App 326, 337; 230 NW2d 414 (1975).

Accordingly, I respectfully dissent. I would reverse the 1997 YTCSC decision and affirm the circuit court's order affirming the termination of petitioner's employment.